IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **BARRY E. GORDON,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) CIVIL ACTION 05-0329-WS-M |
| | ) |
| **ACROCRETE, INC.,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter is before the Court on the Motion for Summary Judgment (doc. 30) submitted by defendant Acrocrete, Inc. ("Acrocrete"). The Motion has been briefed and is ripe for disposition.

**I.      Background.**[1]

In 2000 and 2001, plaintiffs Barry and Beth Gordon (the "Gordons") constructed a 5,800 square-foot dwelling at 32254 River Road on Ono Island in Orange Beach, Alabama. (Gordon Dep., at 13-14, 38.)[2] The house, which was intended to be the Gordons' principal residence, was

---

[1] The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005) (on summary judgment, court must view record and draw all reasonable inferences in light most favorable to nonmoving party). Thus, plaintiffs' evidence is taken as true and all justifiable inferences are drawn in their favor.

[2] Acrocrete has submitted the entire 223-page transcript of Barry Gordon's deposition as an exhibit to its Motion. In so doing, Acrocrete disregards Local Rule 5.5(c), which provides that "[i]f discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response." *Id*. The Court will not undertake to perform an independent inspection of this lengthy transcript in its entirety, scouring it for uncited nuggets of testimony that might prove helpful to movant's cause. Moreover, the Court notes that rather than providing a copy of the official transcript, Acrocrete has filed what appears to be a diskette copy of the deposition transcript opened into a word processor. Discovery materials should be filed in their proper, official form, and in a manner that comports with LR 5.5(c).

substantially completed as of August 2002.  (*Id.* at 93.)  Barry Gordon ("Gordon") acted as the general contractor for this project, and retained various subcontractors to complete the job.  (*Id.* at 35.)  In selecting building materials, the Gordons decided on an insulated concrete form ("ICF") system that would be covered with synthetic stucco exterior cladding.  (*Id.* at 17, 30-33.)  For the ICF system, the Gordons selected a product manufactured by defendants ARXX Building Products, Inc. and ARXX Building Products U.S.A., Inc. (collectively, "ARXX"), which they purchased from a local distributor.  (*Id.* at 53.)[3]  The ARXX product consisted of webbed blocks of polystyrene, hooked on top of each other and with cement poured down the middle of them to create permanent wall form structures.  (*Id.* at 78.)  The decision to utilize the ARXX system was predicated on such factors as product design (*e.g.*, Gordon's perception that ARXX components would be less likely to rust than competitors' products because they had plastic straps), favorable pricing, and convenience (ARXX told plaintiffs that a synthetic stucco finish could be applied directly to the ARXX product on the exterior of the home).  (*Id.* at 48-49, 56.)  Gordon inquired of an ARXX representative, Tom Patton, whether ARXX would "guarantee that application and warranty that" its product could be used in tandem with a stucco finish.  (*Id.* at 57.)  Patton responded affirmatively, on the condition that Gordon utilize an approved synthetic stucco system from an ARXX-provided list, which included stucco products such as Acrocrete.  (*Id.*)  Patton specifically guaranteed that Acrocrete's synthetic stucco product "was approved by his company and warrantied to apply to a Blue Maxx home."  (*Id.* at 61-62.)  In essence, Patton "was guaranteeing that the two products would work together."  (*Id.* at 69.)

Armed with this information from ARXX, Gordon called an independent stucco supplier in Pensacola, Florida.  That supplier advised Gordon that it carried Acrocrete, and placed him in contact with an Acrocrete representative named Brian Lefevre.[4]  (*Id.* at 58.)  Gordon called

---

[3] During the relevant time periods, the ICF system in question was or may have been called "Blue Maxx," before having its name changed to ARXX at some later date.  (Gordon Dep., at 29, 31-32.)  To avoid confusion, and in recognition of its current trade name, this Order will refer to the Gordons' ICF system as the "ARXX system" or the "ARXX product."

[4] The transcript of Gordon's deposition consistently identifies this individual as "Lafaver"; however, as both parties in their summary judgment briefs have utilized the spelling "Lefevre," the Court assumes that the deposition transcript is in error in that regard.

Lefevre and "asked him about application of stucco or EIFS to the exterior of an ICF or Blue Maxx home." (*Id.*) Lefevre responded that Acrocrete stucco was approved for use on an ARXX system. (*Id.*) When Gordon specifically inquired as to whether Acrocrete would guarantee the use of its stucco product on the ARXX system for his home, Lefevre said that it would do so for a period of five years. (*Id.*)[5] Lefevre informed Gordon that he (Lefevre) would meet with the applicators at the Gordons' home, would view the project, and would furnish him with a written warranty upon conclusion of the project. (*Id.* at 179-80.)[6] Furthermore, "he warrantied that his Acrocrete was compatible with the Blue Maxx system ... [a]nd that it would perform." (*Id.* at 181-82.) Gordon testified that plaintiffs decided to use Acrocrete's stucco finish on their home only after receiving that oral five-year guarantee and promise of a written warranty. (*Id.* at 59.)

The Gordons retained a subcontractor named Kyle Anderson, who purchased all of the Acrocrete product necessary to cover the Gordons' home and then applied it. (*Id.* at 75-76.)[7] This installation project began in late 2000. (*Id.* at 184-85.) Lefevre came to the Gordons' home, where he interviewed Anderson to confirm his expertise and training with the Acrocrete system, rendered specific directives to Anderson concerning surface preparation of the ICF blocks, and observed and approved Anderson's techniques. (Anderson Aff., ¶¶ 4-5.) Upon reviewing a test patch that Anderson had prepared, Lefevre instructed him to modify the

---

[5] Gordon's account of this conversation is as follows: "I said, Is your product approved on this product? He said, Yes. I said, So will you guarantee to – guarantee your product applied to the Blue Maxx system, directly to the Blue Maxx system? And he said, Yes, we will. ... [A]fter we talked the scope of the project, he said, I can guarantee your application and product for five years." (*Id.* at 174, 175.) Gordon later clarified that Lefevre guaranteed the Acrocrete product "on the Blue Maxx system." (*Id.* at 175.)

[6] Acrocrete never provided plaintiffs with a written warranty, even though Gordon requested one in April and May 2001, shortly after the stucco project was completed. (*Id.* at 180-81.) Lefevre did not respond to Gordon's three messages for Lefevre, reiterating his request for the written warranty. (*Id.* at 181, 221.) Gordon never received any written materials from Acrocrete, whether in the form of warranties or anything else. (*Id.* at 219-20.)

[7] Anderson had participated in an Acrocrete training program for application of its synthetic stucco system prior to his dealings with Gordon. (Anderson Aff., ¶ 3.) As a result of his training, Anderson received a certificate designating him an approved Acrocrete applicator. (*Id.*)

application process in certain respects. (Gordon Dep., at 185-86.) Lefevre returned to the house a month or two later, when the Acrocrete application was approximately half done, to view its progress. (*Id.* at 187.) At that time, Lefevre told Gordon that "everything was looking fine." (*Id.* at 189.)[8]

The stucco application was completed in April 2001; however, plaintiffs began noticing substantial cracking of that exterior finish, with associated water leakage into the house, approximately 15 months later, in July 2002. (*Id.* at 101-02.)[9] Gordon's theory as to the origins of the cracking problem is that there is a fundamental incompatibility between the ARXX system and the Acrocrete stucco finish. Gordon suggests that the black plastic straps on the ARXX blocks conduct heat, causing them to swell and contract, and that the Acrocrete stucco system fractures because it cannot swell and contract with the underlying straps on the wall blocks. (*Id.* at 90.) These vertical cracks in the stucco appear to be along the lines of the straps, in a uniform pattern on eight inch centers, and are particularly pronounced in areas subject to sun exposure. (*Id.* at 104, 116, 125; Anderson Aff., ¶ 6.) Gordon confronted ARXX's representative, Patton, and asked him if he had ever seen such a cracking problem before, to which Patton responded, "Only in the deep south." (Gordon Dep., at 104-05.) Gordon also contacted Acrocrete's representative, Lefevre, who visited the home to view the problem firsthand. (*Id.* at 112-13.) Lefevre informed Gordon that Acrocrete would not bankroll any repairs or remedial action via monetary payments to plaintiffs. (*Id.* at 114-15.) Gordon next called Acrocrete's home office and spoke to the company's president, Howard Ealer, who indicated that Gordon had not done anything wrong and had not used the wrong product to cover the ARXX wall system. (*Id.* at

---

[8] Plaintiffs' evidence is that Anderson scrupulously adhered to the instructions given by Lefevre for surface preparation and application of the stucco. (Anderson Aff., ¶ 5.)

[9] The water intrusion was coming through the third floor of the house, leaking down to the second floor ceiling, where it was manifested as wet spots. (*Id.* at 119-21.) To halt the leakage, plaintiffs employed the "quick fix" of applying elastomeric paint, at an out-of-pocket expense slightly in excess of $3,000. (*Id.* at 114.) This paint application helped stop the leaking "[f]or a while"; however, the home still experiences "a couple spots that will get a little moisture" today when there is a severe or intense rain event. (*Id.* at 114, 122-23.) The cracks on the Acrocrete material remain readily visible on the exterior of the house, and have worsened over time. (*Id.* at 126.)

116, 118.)  Acrocrete never took action to repair or correct the cracking problem on its synthetic stucco at the Gordons' home.

On April 27, 2005, the Gordons filed suit against Acrocrete and ARXX in the Circuit Court of Baldwin County, Alabama.  Plaintiffs' theories of relief against Acrocrete are as follows: (a) a breach of contract claim alleging that Acrocrete had expressly agreed to provide a written warranty on its finish system, but failed and refused to fulfill its promise (Count One); (b) a breach of warranty claim alleging that Acrocrete "breached express and/or implied warranties of design and materials" (Count Three); and (c) a claim for breach of implied warranties of fitness for a particular purpose and merchantability (Counts Five and Six).[10]  Acrocrete now seeks entry of judgment in its favor as a matter of law on each of these categories of claims.

## II.     Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable

---

[10]     The Complaint also asserts several causes of action against the ARXX defendants.  Because the only motion pending at this time is Acrocrete's motion for summary judgment, the Court need not consider the claims against ARXX for purposes of this Order.  In any event, the undersigned entered an Order (doc. 20) on November 23, 2005, granting summary judgment in ARXX's favor on the implied warranty claims set forth in Counts Five and Six, but denying summary judgment on the breach of contract claim asserted against ARXX in Count Two.

inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

**III.    Analysis.**

   *A.    Breach of Contract Claim (Count One).*

With respect to Count One, the Gordons claim that Acrocrete breached a contract by failing to provide them with a written warranty. More particularly, the crux of Count One is the Gordons' assertion that Acrocrete promised a written warranty as an inducement to them to utilize Acrocrete's exterior cladding system on their home. The deal struck by the parties was that, if the Gordons would purchase Acrocrete's stucco product, then Acrocrete would furnish a written warranty provided that the product were installed in accordance with its specifications. Viewed in the light most favorable to plaintiffs, the record reflects that the Gordons purchased Acrocrete stucco; that their trained, Acrocrete-approved subcontractor (Anderson) installed the product in strict compliance with Acrocrete's instructions; and that Acrocrete expressed satisfaction with the mode and manner of that installation. Thus, there is ample evidence from which a reasonable factfinder could conclude that plaintiffs upheld their end of the bargain. However, when the Gordons contacted Acrocrete for delivery of the written warranty, Acrocrete failed and refused to respond, and never provided the requisite performance that it had promised under the terms of the parties' agreement.

Acrocrete now seeks summary judgment on Count One, arguing that it is "nothing more than a fraud claim disguised as a contract claim" and that Acrocrete's representations to the Gordons cannot give rise to a verbal contract, as a matter of law. (Acrocrete Brief, at 8.) Acrocrete offers no reasoning or authorities to support the latter assertion, but instead relies on the conclusory, self-serving statement that the discussions between Gordon and Acrocrete "do not constitute a contract." (*Id.*) Under Alabama law, the elements of a contract include offer and acceptance, consideration, and mutual assent to terms essential to the contract's formation. *See, e.g., Shewmake v. Estate of Shewmake*, --- So.2d ----, 2006 WL 253846, *4 (Ala. Feb. 3, 2006); *Ex parte Cain*, 838 So.2d 1020, 1026 (Ala. 2002); *Ex parte Payne*, 741 So.2d 398, 403 (Ala.

1999). Movant does not indicate which element(s) it believes to be missing from this fact pattern. The Court finds that there are none. Viewed in the light most favorable to plaintiffs, there was an offer (Acrocrete's promise to provide a written warranty if plaintiffs purchased and properly installed its product), an acceptance (plaintiffs purchased and installed the product in conformity with Acrocrete's directions), consideration (the sale of the product for Acrocrete, the receipt of a written warranty for plaintiffs), and mutual assent.[11] Given that there are record facts supporting the existence of each element of contract here, the Court is at a loss to understand the legal basis for Acrocrete's flat, unsupported statement that the parties' oral agreement does not constitute a contract.

Aside from denying the existence of a contract, defendants maintain that Count One is merely a fraud claim disguised as a contract claim.[12] This contention marks the mirror image of an unsuccessful argument attempted by many litigants in this District Court that a plaintiff has improperly tried to coax a fraud claim out of a mere breach of contract. A transaction that is fraudulent may also be a breach of contract and vice versa, at least where the allegedly fraudulent conduct induces someone to enter into a contract that is later breached. *See, e.g., Johns v. A.T. Stephens Enterprises, Inc.*, 815 So.2d 511, 517 (Ala. 2001) ("In Alabama, a single transaction can support an award of damages for both breach of contract and fraud when there is sufficient evidence in the record to support each claim and each award."); *Ex parte Grand Manor, Inc.*, 778 So.2d 173, 182 (Ala. 2000) (although mere failure to perform promised act is not by itself proof of fraud, a breach of contract may also constitute fraud if the plaintiff proves that when promise was made the defendant intended to deceive); *Hunt Petroleum Corp. v. State*, 901 So.2d 1, 10 (Ala. 2004) ("Under Alabama law, a plaintiff can, in some instances, maintain a cause of action for fraud and breach of contract arising from the same general factual

---

[11] Nor can there be any reasonable argument that this contract was lacking in mutuality. "So long as there is a valuable consideration moving from one side to the other, or there are binding promises on the part of each party to the other, there is adequate consideration for a valid contract." *Orkin Exterminating Co. v. Larkin*, 857 So.2d 97, 102 (Ala. 2003).

[12] Acrocrete suggests that plaintiffs artfully pleaded Count One as a breach of contract claim because they were cognizant that any fraud formulation of that claim would be time-barred and, hence, doomed.

circumstances.") (Houston, J., concurring specially). The two theories of relief are not mutually exclusive; to the contrary, they may peacefully coexist and are routinely raised as complementary grounds for liability by Alabama plaintiffs. That Acrocrete's alleged statements inducing Gordon to enter into a contract may have been fraudulent does not preclude them from also being actionable on a breach of contract theory, provided that the elements of contract formation have been satisfied (as they have here, at least for summary judgment purposes).

Nor does the case law bolster defendant's argument. The undersigned is aware of no authorities that lend support to the proposition that a breach of contract is not actionable as such if the defendant intended to deceive in the formation of such contract. There is Alabama law to the contrary. *See Deupree v. Butner*, 522 So.2d 242, 244 (Ala. 1988) (where a seller makes misrepresentations in formation of the contract, "the buyer need not forgo the benefit received under the contract in order to sue for the misrepresentations") (citation omitted).[13] The potential for a fraud claim neither trumps nor pretermits the contract claim actually asserted, if the elements of a contract are present. Instead, both contract and fraud claims share an equal footing, with neither predominating over or negating the other. As one jurist prudently put it, "It is no more desirable to have tort law drown in a sea of contract than to have contract law drown in a sea of tort." *Hunt*, 901 So.2d at 11 (Houston, J., concurring specially).

In short, the Court is of the opinion that the Gordons have come forward with competent summary judgment evidence to support the presence of each element of a contract, as well as evidence that Acrocrete breached such contract. Accordingly, Acrocrete is not entitled to summary judgment on Count One.

---

[13] Acrocrete expounds on its position by stating that the implications of allowing the Gordons to pursue breach of contract claims here would be unjust and unfair. Specifically, Acrocrete posits that if plaintiffs can proceed on a breach of contract theory here, then one who receives literature from an auto manufacturer that contains misrepresentations could sue on both contract and fraud grounds. (Acrocrete Brief, at 8.) Defendant's fears are unjustified. The analogy is ill-fitting, and nothing in this case would compel such a result in the car literature context. Taken in the light most favorable to plaintiffs, this case is one in which (a) Acrocrete specifically promised a written warranty to plaintiffs if plaintiffs bought their product, (b) plaintiffs bought the product, and (c) Acrocrete refused to perform. Such circumstances bear no substantial resemblance to the "product-literature-as-contract" scenario on which Acrocrete seeks to rely.

### B. *Implied Warranty Claims (Counts Five and Six).*

In Counts Five and Six, plaintiffs proffer claims against Acrocrete under the implied warranties of merchantability and fitness for a particular purpose, as created by Alabama's version of the Uniform Commercial Code, Ala. Code § 7-1-101, *et seq.* ("UCC").  Under the clear language of the UCC, however, these implied warranties apply only to the sale of goods. *See* Ala. Code § 7-2-102 ("this article applies to transactions in goods").  In *Keck v. Dryvit Systems, Inc.*, 830 So.2d 1 (Ala. 2002), the Alabama Supreme Court explained that an attachment to realty is a "good" for UCC purposes only if it is capable of severance without material harm to the realty.  Both the Gordons and Acrocrete agree that *Keck* is controlling precedent, that Acrocrete's stucco finishing system is not severable from the realty without causing substantial harm, and that the UCC's implied warranties of merchantability and fitness for a particular purpose are therefore unavailable to plaintiffs here.  (Plaintiffs' Brief, at 4; Acrocrete Brief, at 4-6.)  It is undisputed that plaintiffs cannot recover from Acrocrete on theories of breach of Alabama's implied warranties of merchantability and fitness for a particular purposes because the product in question is not a "good."  Therefore, Acrocrete is entitled to summary judgment on Counts Five and Six.  *See Gordon v. Acrocrete, Inc.*, 400 F. Supp.2d 1310, 1313-14 (S.D. Ala. 2005) (dismissing implied warranty claims against co-defendant on the same basis).[14]

### C. *Express/Implied Warranty Claims as to Design and Materials (Count Three).*

In Count Three, plaintiffs charge Acrocrete with breach of "express and/or implied warranties of design and materials relative to the finish system used in the construction of the Gordons' home." (Complaint, ¶ 19.)  Plaintiffs have identified no source of implied warranties other than the UCC, and all UCC-related implied warranty claims have been dismissed for the reasons set forth *supra*.  To the extent, then, that Count Three is redundant of Counts Five and

---

[14] These causes of action were previously dismissed as to the ARXX defendants via Order (doc. 20) dated November 23, 2005.  In light of their assent to the dismissal of such claims on summary judgment, the Gordons could have spared both Acrocrete and this Court unnecessary expenditure of time and effort by voluntarily dismissing Counts Five and Six, instead of obliging Acrocrete to endure the formality of requesting entry of summary judgment on such admittedly non-meritorious claims for relief.

Six in reiterating claims for breach of implied warranties created by the UCC, that claim is due to be, and the same hereby is, **dismissed**.

But Count Three unquestionably invokes express warranties, as well. There is competent summary judgment evidence that Acrocrete (by and through its agent, Lefevre) orally warrantied that Acrocrete's synthetic stucco finish system was compatible with the ARXX system, that it would perform if the two were used together, and that the Acrocrete product was guaranteed to work with the ARXX system for five years. There is also competent evidence in the record that Acrocrete breached this express warranty by failing to honor or stand by it when given actual notice by the Gordons that its product had failed.

In seeking summary judgment on Count Three, Acrocrete argues that express warranties are limited to the sale of "goods" under the UCC, and that the synthetic stucco, as a non-severable attachment to realty, cannot be a good. In response, plaintiffs maintain that the express warranties in question are not rooted in the UCC, but do not identify the legal foundation of such claims.[15] Regrettably, neither party offers a single case authority to support its position that express warranty claims are or are not confined to the UCC under Alabama law, instead limiting its arguments to bald, conclusory statements.

Defendant's position holds some superficial appeal. In general, causes of action for express warranty in Alabama arise under the UCC. Alabama Code § 7-2-313 explains that express warranties are created when a seller makes affirmations of fact or promise relating to the goods that become part of the basis of the bargain, when a seller's description of the goods is made part of the basis of the bargain, and when a sample or model is made part of the basis of the bargain. Several Alabama cases suggest that express warranty claims are creatures of the UCC. *See Southern Energy Homes, Inc. v. Washington*, 774 So.2d 505, 512 (Ala. 2000) ("Express warranties are governed by § 7-2-313, Ala.Code 1975"); *Ex parte Miller*, 693 So.2d 1372, 1376 (Ala. 1997) (declaring that express warranties in Alabama are governed by § 7-2-313 and that "[i]n Alabama, the crux of all express warranty claims is that the goods did not conform

---

[15] The sum and substance of plaintiffs' response to Acrocrete's express warranty argument is that "Plaintiffs do not assert express warranties arising out of the Uniform Commercial Code regarding the sale of goods, but an express warranty to guarantee the system for five (5) years." (Plaintiffs' Brief, at 3.)

to the warranty"). For the reasons set forth in the discussion as to Counts Five and Six, *supra*, Alabama law compels a finding that the Acrocrete stucco system affixed to plaintiffs' home does not qualify as a "good" for UCC purposes because it is not severable from the realty without causing material harm. As such, plaintiffs cannot maintain a UCC-based claim against Acrocrete for breach of express warranty.

However, a more nuanced examination reveals that express warranty claims in Alabama do have independent vitality outside of the UCC. As an initial proposition, Alabama courts have been quite clear that "[a]n action alleging a breach of warranty is a subset of a breach-of-contract action." *Turner v. Westhampton Court, L.L.C.*, 903 So.2d 82, 90 (Ala. 2004); *see also Miller*, 693 So.2d at 1376 ("Express warranties should be treated like any other type of contract and interpreted according to general contract principles."). Just as there is a common-law right of action sounding in breach of contract, so too is there one sounding in breach of express warranty, because the greater necessarily includes the lesser. Besides, it would approach absurdity to hold, as Acrocrete argues, that express warranties are *per se* invalid and unenforceable unless they relate to the sale of "goods" within the meaning of the UCC. Such an outcome would work extreme unfairness upon consumers who purchase fixtures in reliance on a seller's express warranties, because such warranties (beyond the grasp of the UCC) would be reduced to empty words that could never be enforced. Thus, the result urged by Acrocrete here would strip Alabama consumers of any remedy for express warranties made by sellers in connection with the purchase of synthetic stucco products. Perhaps recognizing the chaos and inequity that such a regime would spawn, Alabama courts have permitted express warranty claims to move forward in the context of stucco products akin to that at issue here. For example, the Alabama Supreme Court in *Turner* gave full force and effect to a written warranty provided by a vendor to the purchaser of a new house wherein the synthetic stucco was alleged to have failed. Alabama appellate courts have relied on UCC law to interpret and construe express warranty agreements arising from synthetic stucco warranties, even as they have recognized that the UCC does not technically apply to such warranties. *See Desouza v. Lauderdale*, --- So.2d ----, 2005 WL 1532344 (Ala.Civ.App. June 30, 2005) (per Pittman, J., with four judges concurring in result) (deeming Article 2 of UCC persuasive in analysis of synthetic stucco warranty claims even though it does not apply to real-estate transactions).

In light of the foregoing, Acrocrete's position that warranties relating to stucco are never actionable in Alabama, as a matter of law, is untenable. The Rule 56 motion is **denied** with respect to the express warranty claims of Count Three.

### IV.    Conclusion.

For all of the foregoing reasons, the Motion for Summary Judgment (doc. 30) is **granted in part**, and **denied in part**. The Motion is **granted** with respect to Count Five, Count Six, and the implied warranty claims in Count Three. Those causes of action are **dismissed** with respect to defendant Acrocrete. The Motion is **denied** with respect to Count One and the express warranty claims in Count Three.

DONE and ORDERED this 24th day of April, 2006.

s/ WILLIAM H. STEELE  
UNITED STATES DISTRICT JUDGE